**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Newport News Division**

| | |
|---|---|
| KELVIN STOKES, ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| v. ) | **Civil Action No. _____** |
| ) | **TRIAL BY JURY DEMANDED** |
| SHANTINATH CIS LLC, ) | |
| D/B/A COUNTRY INN & SUITES BY ) | |
| RADISSON AT BUSCH GARDENS, ) | |
| PREET SHAH, and BHAGYESH VORA, ) | |
| ) | |
| **Defendants.** ) | |

## COMPLAINT

Plaintiff Kelvin Stokes, by counsel, files this Complaint against Defendants Shantinath CIS LLC d/b/a Country Inn & Suites by Radisson at Busch Gardens, Preet Shah, and Bhagyesh Vora. Stokes's Complaint arises from Defendants' refusal to promote, failure to provide overtime compensation to, and subsequent termination of Plaintiff, not for any legitimate reasons, but, rather, because of who Plaintiff is as a person – a 60-year-old, African-American, Muslim. Accordingly, Plaintiff asserts claims herein against Defendants for their respective violations of Title VII of the Civil Rights Act of 1964, Section 1981 of the Civil Rights Act of 1866, the Age Discrimination in Employment Act of 1967, and the Fair Labor Standards Act of 1938.  In support of these claims, Plaintiff alleges as follows:

### PARTIES

1.    Plaintiff Kelvin Stokes ("Stokes") is an individual, a natural person, and, at all times relevant, a citizen of Virginia residing in Williamsburg, Virginia.

2.    Shantinath CIS LLC d/b/a Country Inn & Suites by Radisson at Busch Gardens

1

Shantinath ("Shantinath") is a Virginia corporation, both singularly and collectively as comprised from its related affiliates, subsidiaries, and businesses, that regularly conducts business in Williamsburg, Virginia. At all times relevant, Shantinath was located at 7135 Pocahontas Trail, Williamsburg, Virginia 23185 and was Stokes's employer for all relevant purposes herein.

3.       Preet Shah ("Shah") is an individual, natural person, and, at all times relevant, a citizen of Virginia residing in Williamsburg, Virginia. At all times relevant, Shah was the owner and manager of Shantinath and Stokes's employer and supervisor.

4.       Bhagyesh Vora ("Vora") is an individual, a natural person, and, at all times relevant, a citizen of Virginia residing in Williamsburg, Virginia. At all times relevant, Vora was also the owner and manager of Shantinath and Stokes's employer and supervisor.

## JURISDICTION AND VENUE

5.       Stokes incorporates and re-asserts fully herein the allegations of paragraphs 1 through 4, *supra*.

6.       This Court possesses original jurisdiction over Stokes's claims below, pursuant to 28 U.S.C. § 1331, because these claims arise under the Constitution and laws of the United States.

7.       This Court, namely the Newport News Division of the Eastern District of Virginia, is the proper venue for Stokes's Complaint, pursuant to 28 U.S.C. § 1391, because Shantinath, Shah, and Vora are located in Williamsburg, Virginia and the events, *infra*, occurred there.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

8.       Stokes incorporates and re-asserts fully herein the allegations of paragraphs 1 through 7, *supra*.

9.       Prior to filing this Complaint, Stokes timely filed a Charge of Discrimination ("Charge") against Shantinath in the Norfolk, Virginia Office of the Equal Employment

Opportunity Commission ("EEOC") on January 22, 2020.  The Charge claimed age, race, and religion discrimination for, *inter alia*, Shantinath's failure to promote and subsequent termination of Stokes.  The Charge also claimed retaliation.    In the Charge, Stokes asserted his claims, pursuant to Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act of 1967.

10.    Shah appeared on behalf of and defended Shantinath in the EEOC proceedings.

11.    On May 20, 2021, the EEOC determined that reasonable cause existed to believe Shantinath had discriminated and retaliated against Stokes.

12.    Subsequently, the EEOC attempted a conciliation but was unable to obtain a settlement between Stokes and Shantinath.

13.    Accordingly, on July 30, 2021, the EEOC issued a right-to-sue letter, which Stokes promptly received, authorizing Stokes to file the instant Complaint.

14.    Prior to the filing of the instant Complaint, Stokes and Defendants entered into a tolling agreement to extend the Complaint filing date to January 10, 2022 and to allow an attempt to resolve the claims herein.  Despite Plaintiff's good faith and reasonable efforts, Defendants did not reciprocate those efforts, thereby requiring the filing of this Complaint.  Accordingly, Stokes now timely files this Complaint.

## STATEMENT OF FACTS

15.    Stokes incorporates and re-asserts fully herein the allegations of paragraphs 1 through 14, *supra*.

16.    Stokes is 60 years-old, African-American, and Muslim.

17.    Since 1980, Stokes has been employed in hospitality, specifically in the hotel industry.

18.     Stokes has held all primary positions and performed all primary duties in the hotel industry.  For example, he has been employed as a general manager, assistant general manager, night manager, auditor, front desk manager, maintenance person, and bellman.  As for his duties, he has handled or participated in, *inter alia*, accounting, budgeting, checking guests in and out, customer service, housekeeping, maintenance, repairs, securing reservations, ordering supplies, and management of and employment decisions concerning employees.  While these positions and duties are not exhaustive of Stokes's experience, they illustrate that he has over the past 40 years accumulated a wealth of significant and well-rounded experience in this industry.

19.     In August of 2001, Stokes began his employment at a hotel at the above-alleged Williamsburg, Virginia, address.  At the time, the hotel was a Howard Johnson.  In 2005, the Howard Johnson became a Park Inn.  In 2006, the Park Inn became a Country Inn & Suites.  Starting in 2001 and until March of 2018, Stokes worked at this location, performed most if not all of the above positions and duties above, and also accumulated a wealth of relevant knowledge about the location itself, including its unique business, clientele, and institutional operations.

20.     During the period alleged in paragraph 19 above, Defendants did not own, manage, operate, or have any business affiliation with the location.

21.     From 2001 to March of 2018, Stokes met or exceeded employment expectations, never received a negative evaluation, and was never the subject of discipline.  In fact, Stokes cannot recall missing a single day of work during the time period above.

22.      In March of 2018, Shantinath purchased the County Inn & Suites location (hereinafter the "Hotel").  Thereafter, Shah and Vora owned the Hotel and acted as Shantinath's agents, general managers, representatives, and supervisors.

23.     Neither Shah nor Vora are African-American.  Shah and Vora are Indian, non-

Muslim, and substantially younger than Stokes.

24.     Upon information and belief, Defendants learned of Stokes's positive and significant employment history and record above following their acquisition of the Hotel.

25.     Thereafter, Shah commenced to reside personally at the Hotel.   There, in consultation with Vora, he managed full-time and on-site the Hotel, its business, employees, and operations.

26.     Under the direct supervision of Shah and Vora, Stokes continued to work as a night auditor/manager.   In this capacity, he performed duties at the Hotel including settling and processing financial transactions, running the nightly audit reports, performing customer service, engaging in client relations, ordering hotel equipment and supplies, checking guests in and out, communicating with housekeeping and maintenance, and handling administrative duties.

27.     Stokes's duties did not include the handling and preparation of Shantinath's morning breakfast service for the Hotel's guests.   In fact, Stokes had no real background, experience, or training in such service.

28.     Furthermore, Stokes's duties at the Hotel did not primarily involve management, despite his title.   Rather, in performing the duties above, Stokes was directed and, in practice, micro-managed by Shah.   Thus, Stokes exercised little to no discretion and judgment concerning matters of significance at the Hotel.

29.     As one example, Stokes's duties did not include the interviewing, hiring, determining the compensation for, supervising, preparing schedules for, directing the work of, promoting, disciplining, firing, or otherwise engaging in any oversight of any of Defendants' employees.

30.     Shortly after Defendants' acquisition of the Hotel, Stokes approached Shah and

Vora and expressed his interest in a promotion to assistant general manager. Defendants had no assistant general manager at the time and, although not publicly advertised, the position was open.

31.     Given his significant background and experience above, Stokes was more than qualified for the position. Defendants were fully aware of Stokes's qualifications for the position.

32.     Nonetheless, Shantinath, through Shah and Vora, did not promote Stokes to the position and, instead, kept it open. As the position remained open, they required a colleague of Stokes, who was Caucasian, to perform the duties of the assistant general manager.

33.     Upon information and belief, Shantinath, through Shah and Vora, did not want to have an African-American act in such a high-level position and, in so doing, be a chief face of its guest relations.

34.     In July of 2018, Shantinath's relief auditor separated from his employment at the Hotel.

35.     At the time, Stokes had been working full-time for Defendants, five (5) days a week, and from the hours of 11:00 p.m. to 7:00 a.m. He was also classified as an hourly employee and earning a wage of $14.00 per hour. Stokes's annual income, therefore, was approximately $29,120.00.

36.     Rather than promote Stokes, Defendants requested in July of 2018 that he assume the duties of the former relief auditor. Assuming these additional duties entailed that Stokes had to work an additional two (2) days a week, or, now, seven (7) days a week.

37.     Intending to demonstrate that he was a team player and deserved the promotion to assistant general manager, Stokes assumed the additional duties.

38.     Stokes's assumption of these duties, however, entailed other changes to his employment relationship with Defendants, all of which were materially unfavorable to Stokes.

39.     First, Defendants now required Stokes to work seven (7), not five (5), days a week and at his same schedule, for a total of 56 hours per week.  In short, Defendants increased the number of hours Stokes must work by nearly 40%, excluding any additional hours of work Stokes performed during the week above the set 56 hours per week.  In practice, Stokes began to work these hours plus an estimated additional three (3) hours each week due to his coverage of other employees who came in late or did not show, totaling approximately 59 hours each week thereafter. Defendants were aware that Stokes, in practice, was working all of these hours over 40 hours.

40.     Second, at the same time, Defendants required Stokes to become a salaried employee.  They intended to pay him a salary of only $31,000.00.  In short, this salary resulted in an actual and significant pay decrease for Stokes from $14.00 per hour to $10.64 per hour.  In fact, had Stokes simply continued as an hourly employee, his annual income would have increased to $49,868.00 with all of the additional hours he now was required to work (observing overtime pay to included 19 hours each week at a time and a half rate of $21.00).

41.     Prior to Defendants' acquisition of the Hotel, the former owner of the location had posted notices concerning employee rights under, *inter alia*, the Fair Labor Standards Act. Defendants did not remove those notices but kept them in place, demonstrating their awareness and knowledge of their legal obligations.  Indeed, Defendants were keenly aware of their legal obligations with respect to compensation, hours, and overtime.

42.     Nevertheless, in this context, Defendants started paying Stokes less money for substantially more work.

43.     Stokes, who had been at the Hotel's location for nearly 18 years and who was nearly 60 years of age had little choice but to agree to these requirements to keep his job.  He also did not want to complain because he was interested in the promotion above.

44.     In return, Shah and Vora promised Stokes a small token - he may take any day off he desired so long as he placed the day on the work calendar reasonably in advance.  They also promised Stokes they intended to hire a replacement relief auditor in the near future, so Stokes newly-assumed duties were only temporary in nature.

45.     Upon information and belief, Defendants had no intention to honor these promises.

46.     In late 2018, Defendants hired Jessica Ordonia ("Ordonia") as a front desk clerk. In an unusual turn, they did so after consulting with Stokes, as Stokes had worked with and known her.  The primary duty of a front desk clerk was to check guests in and out of the premises.  The front desk clerk's overall duties were significantly fewer and of less significance than the duties Stokes performed.

47.     Ordonia is Caucasian.  Upon information and belief, she was also between 25 and 30 years old at the time Defendants hired her.  Compared to Stokes, Ordonia possessed significantly less hotel experience, including at the Hotel itself, and was not qualified for a management position.  In fact, upon further information and belief, Ordonia had never served in a significant hotel management position prior to Defendants hiring her.

48.     After her hiring, Ordonia was less than a model employee.  Stokes observed that she required frequent attention, guidance, and training.  Although training was not a duty he regularly performed, he assisted in training Ordonia by answering her many and frequent questions.  Ordonia also frequently called out of work.  As a result, Stokes often assumed the burden of Ordonia's duties on little to no notice.

49.     Like Ordonia, Shah and Vora often came to Stokes for advice, guidance, and with questions about the Hotel management and operations.  Of course, they rarely followed or relied upon his advice, guidance, and answers, notwithstanding their value.

50.     At the Hotel, Stokes met or exceeded his performance expectations.  Defendants never disciplined him or communicated to him that his performance in any aspect was poor or in need of improvement.  Stokes also rarely requested a day off from or missed work, despite being allegedly promised the ability to do so.

51.     By October 5, 2019, Defendants had still hired no relief auditor, despite their earlier promise.

52.     And on October 5, 2019, Stokes learned that Defendants had promoted Ordonia to the assistant general manager position.  They never even interviewed Stokes.

53.     Stokes was devastated at being passed over.

54.     Thereafter, Stokes attempted to discuss with Defendants their basis for passing him over.  However, each time he attempted to discuss the matter, they avoided the conversation.

55.     For example, when Stokes approached Shah, Shah stated that Stokes needed to discuss the matter with him when Vora was at the Hotel.  Of course, as Shah knew, Vora came infrequently to the Hotel.  And, when he did come to the Hotel, Shah informed Stokes that Shah was too busy to meet with the two of them to discuss the matter.

56.     This intentional avoidance continued from October of 2019 into January of 2020.

57.     Under the circumstances, no legitimate, non-discriminatory, and genuine basis existed for Defendants to pass over Stokes for the promotion.  Defendants knew as much and also that Ordonia was significantly less-qualified than Stokes, inexperienced, and had been under-performing since her hire.  In other words, Defendants avoided Stokes on the matter because they had no basis above to explain to Stokes and hoped he would simply move on from the topic.

58.     Again, as Shah and Vora had demonstrated in 2018, they did not want to have an African-American act as the assistant general manager and, thus, be a primary face of guest

9

relations, particularly during the day-time hours when business was heaviest.

59.     In early November of 2019, Stokes provided advance notice on the calendar of two days off, specifically December 9, 2019 and December 31, 2019 (New Year's Eve).

60.     Despite his earlier promise, Shah refused Stokes the day off for December 31, 2019. Instead, he informed Stokes that Ordonia was taking the day off.  Yet, no request by Ordonia for the day off appeared on the calendar, which Shah required Stokes use.

61.     Again, Stokes requested a meeting in late December 2019 with Shah and Vora to discuss his employment, including his compensation, hours, and the bases for which he had been passed over.  Upon information and belief, such a direct meeting was Defendants' only avenue of presenting, or filing, a grievance related to employment at the Hotel.

62.     Only Shah met with Stokes.  At the meeting, Stokes requested the opportunity to return to his five (5) day work week and complained about the long hours he was working and his compensation.  Shah agreed to return him to the earlier schedule, effective January 1, 2020. However, he informed Stokes that the return was only temporary and he had to speak with Vora.

63.     At this same meeting, Stokes again inquired from Shah the basis for his being passed over for the promotion.  Again, Shah avoided the topic and stated he needed Stokes to discuss the matter with him when Vora was at the Hotel.

64.     On January 13, 2020, Stokes met with Vora to discuss his employment, schedule, compensation, and hours, and being passed over for the promotion.  Shah declined to attend this meeting, claiming he was too busy.

65.     Stokes raised the same issues with Vora that he had raised during his meeting with Shah in late December of 2019.

66.     As to the five (5) day work week, Vora informed Stokes that the return to a five (5)

10

day work week and, in sum, Stokes's continued employment was only possible if Stokes assumed additional duties.  Specifically, Vora required that Stokes assume the duty of preparing and handling the Hotel's morning breakfast service for guests.  Vora conveyed that Stokes must set out pastries, prepare eggs, oatmeal, biscuits, and heat up precooked food such as pork, bacon, and sausage.

67.    As to the basis for being passed over, Vora declined to discuss the matter with Stokes without Shah being present.  It was evident that Stokes was receiving the run-around from Defendants concerning this topic.

68.    As to the new duty above, Stokes had no real experience or training in the preparation and handling of a hotel breakfast service.  And this duty fell entirely outside of and substantially below Stokes's level of experience, qualifications, position, and responsibilities.

69.    What is more, Stokes is Muslim.  Due to a bona fide and sincerely held religious belief, he was unable cook, eat, handle, inhale, or be in close proximity to pork products.  Assuming this duty entailed he must violate his sincerely held religious beliefs and practices.

70.    Defendants were aware from their prior conversations with Stokes of his religion and bona fide and sincere belief that, as a result, his inability to cook, eat, handle, inhale, or be in close proximity to pork products.

71.    Accordingly, Stokes objected to assuming the duty for this reason.

72.    In response, Vora did not accommodate Stokes.  Rather, he notified Stokes that if he did not assume the duty, then Defendants were unable to pay him.  In other words, Stokes would be out of a job.  Vora then terminated the meeting.

73.    On January 20, 2020, Stokes complained to Shah that he believed the breakfast duty (and ultimatum from Vora) discriminated against him because of his religion.  He again raised

11

issues pertaining to his compensation and hours.

74. Upon receipt of this complaint, Shah terminated Stokes on the spot, stating, "well, then we cannot afford to pay you."

75. At no time prior to this termination did Defendants attempt in any meaningful way to accommodate Stokes's bona fide and sincerely held religious beliefs and practices.

76. And, just like that, Defendants removed Stokes from the Hotel and a location at which he had worked for nearly two (2) decades, invested a large part of his life, and had thought of as a second home.

77. Subsequently, Stokes had no choice but to file for unemployment benefits. Shantinath contested the filing, and Shah personally appeared on its behalf. Like the EEOC, the Virginia Employment Commission ruled in Stokes's favor, awarding him benefits.

78. Then COVID-19 struck. Despite his reasonable efforts, and given his age, Stokes was unable to find any comparable employment for nearly 18 months. Absent Defendants' conduct, Stokes would never have been in such a dire position.

**COUNT I**
**Discrimination in Violation of Title VII of the Civil Rights Act of 1964**
**(Race)**
**(Defendant Shantinath CIS, LLC)**

79. Stokes incorporates and re-asserts fully herein the allegations of paragraphs 1 through 78, *supra*.

80. Shantinath's refusal to promote and subsequent termination of Stokes violated the anti-discrimination provisions of Title VII with respect to Stokes's race.

81. Title VII directs, "[i]t shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment,

12

because of such individual's **race**, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1) (alteration and emphasis added).

82.     Shantinath both singularly and collectively as comprised from its related affiliates, subsidiaries, and businesses, meets the definition of an employer under Title VII.  42 U.S.C. § 2000e-(b).

83.     At all times relevant, Shantinath acted as Stokes's employer, through Shah and Vora.  Shah and Vora acted as Shantinath's owners, agents, managers, representatives, and supervisors.

84.     Shantinath employed Stokes from March of 2018 until January 20, 2020.

85.     Shantinath violated Title VII for the reasons alleged, *supra*, including but not limited to by refusing to interview and promote Stokes, decreasing his pay while significantly increasing his hours, demanding Stokes perform subordinate duties, and terminating his employment, all because of his race.

86.     Stokes is African-American and, thus, a member of a protected class.

87.     Stokes suffered the above adverse employment actions at the hands of Shantinath, by and through Shah and Vora.

88.     At all times relevant, Stokes had been performing his position satisfactorily and/or meeting Shantinath's legitimate expectations.

89.     Nonetheless, Shantinath promoted a significantly lesser-qualified, inexperienced, and under-performing employee, Ordonia, to the assistant general manager position in which Stokes had expressed his interest.  It did so without even offering Stokes an interview.  Upon information and belief, and based upon its past practice, Shantinath wanted a Caucasian to perform the duties of the assistant general manager and, thus, serve as the primary face of guest relations

at the Hotel, particularly during the daytime hours when business traffic was heaviest.

90.     Shantinath had no legitimate, non-discriminatory, and genuine basis to refuse Stokes the promotion and pass him over.  Certainly, Shantinath, through Shah and Vora, never complained to Stokes about his performance or disciplined him.  And, each time Stokes attempted to inquire about the matter, Defendant, through Shah and Vora, avoided the discussion, hoping Stokes would just go away.

91.      What is more, Shantinath, through Shah and Vora devised an impossible catch-22 scenario for Stokes to assure the end of his employment.  They did so by requiring he assume a subordinate duty they knew he was unable to assume – the breakfast service.  Then, Shantinath used it as a pretext for his termination.

92.     Shantinath's treatment of Stokes occurred under facts and circumstances giving rise to an inference of impermissible race discrimination.

93.     Shantinath's treatment of Stokes was intentional, deliberate, willful, racially motivated, wanton, malicious, reckless, and in conscious disregard of Stokes's right to be free from racial discrimination.

94.     As a direct and proximate cause of the same, Stokes has suffered monetary and non-monetary damages, including loss of back pay, emotional distress, reputational harm, embarrassment, humiliation, shame, and a loss of enjoyment of life.

**COUNT II**
**Discrimination in Violation of Section 1981 of the Civil Rights Act of 1866**
**(Race)**
**(Defendant Shantinath CIS, LLC)**

95.     Stokes incorporates and re-asserts fully herein the allegations of paragraphs 1 through 94, *supra*.

96.     Section 1981 of the Civil Rights Act of 1866 mandates that "[a]ll persons within

the jurisdiction of the United States shall have the same right in every State . . . to make and enforce contracts, . . . and to the full and equal benefit of all laws . . . as is enjoyed by white citizens . . . ." (Alterations added).  42 U.S.C. § 1981.

97.     At all times relevant, Shantinath was a private employer and contracted with Stokes for an at-will employment relationship.  It acted through Shah and Vora, and Shah and Vora acted as Shantinath's owners, agents, managers, representatives, and supervisors.

98.     For the same reasons alleged, *supra*, in paragraphs 79 through 94 of Count I, Shantinath racially discriminated against Stokes, in violation of 42 U.S.C. § 1981.  Stokes reasserts and incorporates those alleged reasons here.

99.     Shantinath's treatment of Stokes was intentional, deliberate, racially motivated, willful, wanton, malicious, reckless, and in conscious disregard of Stokes's right to be free from racial discrimination.

100.    As a direct and proximate cause of the same, Stokes has suffered monetary and non-monetary damages, including loss of back pay, emotional distress, reputational harm, embarrassment, humiliation, shame, and a loss of enjoyment of life.

## COUNT III
**Discrimination and Retaliation in Violation of Title VII of the Civil Rights Act of 1964 (Religion) (Defendant Shantinath CIS, LLC)**

101.    Stokes incorporates and re-asserts fully herein the allegations of paragraphs 1 through 100, *supra*.

102.    Shantinath's termination of Stokes violated the religion anti-discrimination and anti-retaliation provisions of Title VII.

103.    Concerning anti-discrimination, Title VII directs, "[i]t shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or

otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, **religion**, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1) (alteration and emphasis added).

104.    Concerning anti-retaliation, Title VII mandates, "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter . . . ." 42 U.S.C. § 2000e-3(a).

105.    Shantinath, both singularly and collectively as comprised from its related affiliates, subsidiaries, and businesses, is an employer under Title VII.  42 U.S.C. § 2000e-(b).  Shah and Vora acted as Shantinath's owners, agents, managers, representatives, and supervisors.

106.    At all times relevant, Shantinath acted as Stokes's employer through Shah and Vora, and Shah and Vora acted as Shantinath's owners, agents, managers, representatives, and supervisors.

107.    Shantinath employed Stokes from March of 2018 until January 20, 2020.

108.    Shantinath violated Title VII by compelling Stokes to assume an employment duty contrary to his bona fide and sincerely held religious belief and then terminating his employment when he opposed that duty and complained of religion discrimination.

109.    Stokes is a practicing Muslim.  As a practicing Muslim, he had a bona fide and sincerely held religious belief that conflicted with Shantinath's employment requirement, namely that Stokes assume the duty to prepare the morning breakfast for guests at the Hotel and, thus, cook, handle, inhale, and be in proximity to pork products.

110.    At the time of this requirement, Shantinath, through Shah and Vora, was aware that Stokes was a practicing Muslim and, due to the above belief, was unable to assume the duty.

16

Nonetheless, Shantinath conditioned his employment on assumption of the duty and created an impossible, catch-22 scenario for Stokes.

111.    Upon learning of this requirement, Stokes objected to it.  He informed Shantinath of his objection on January 13, 2020 and of religion discrimination on January 20, 2020.

112.    Rather than accommodate Stokes in any meaningful or reasonable manner, Shantinath responded by conditioning Stokes's employment upon assumption of the duty, per the above allegations.

113.    When Stokes complained on January 20, 2020 to Shah, Shah subjected him to an adverse employment action, namely termination on the spot, stating, "well, then we cannot afford to pay you."

114.    Stokes's complaint of religious discrimination was based upon a reasonable belief of such discrimination.

115.    A causal connection exists between Stokes's opposition activity and termination.

116.    No legitimate, non-discriminatory, and genuine basis existed for Stokes's termination.  Certainly, Shantinath, acting through Shah and Vora, never conveyed any dissatisfaction to Stokes of his performance or disciplined him in any way, and Stokes had otherwise met or satisfied legitimate employment expectations.

117.    Shantinath's termination of Stokes occurred under facts and circumstances that give rise to an inference of impermissible religion discrimination.

118.    Shantinath's treatment of Stokes was intentional, deliberate, willful, wanton, malicious, reckless, and in conscious disregard of Stokes's right to be free from religion discrimination and from retaliation for his opposition to such discrimination.

119.    As a direct and proximate cause of Defendants' conduct, Stokes has suffered

monetary and non-monetary damages, including loss of back pay, emotional distress, reputational

harm, embarrassment, humiliation, shame, and a loss of enjoyment of his life.

## COUNT IV
## Discrimination in Violation of the Age Discrimination in Employment Act of 1967
## (Defendant Shantinath CIS, LLC)

120.    Stokes incorporates and re-asserts fully herein the allegations of paragraphs 1

through 119, *supra*.

121.    Shantinath's termination of Stokes violated the age anti-discrimination provision

of the Age Discrimination in Employment Act of 1976 ("ADEA").

122.    The ADEA directs, in pertinent part, "[i]t shall be unlawful for an employer . . . to

fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual

with respect to his compensation, terms, conditions, or privileges of employment, because of such

individual's age."  29 U.S.C § 623(a)(1) (alteration added).

123.    Shantinath violated the ADEA by, *inter alia*, refusing to interview and promote

Stokes, decreasing his pay, imposing additional and subordinate duties upon him, and terminating

his employment under a pretextual, catch-22 scenario.

124.    At all times relevant, Shantinath met the definition of an employer under the

ADEA, both singularly and collectively as comprised from its related affiliates, subsidiaries, and

businesses.  29 U.S.C. § 630(b).  Shah and Vora acted as Shantinath's owners, agents, managers,

representatives, and supervisors.

125.    Shantinath employed Stokes from March of 2018 until January 20, 2020.

126.    Stokes is currently 60 years of age and, at the time of the above events, was in his

late fifties.  Accordingly, because Stokes is above the age of 40, he is a member of a class protected

by the ADEA.

127.    Stokes suffered the above adverse employment actions at the hands of Shantinath, by and through Shah and Vora.

128.    At all times relevant, Stokes had been performing his position satisfactorily and/or meeting Shantinath's legitimate expectations.

129.    Stokes expressed an interest in the assistant general manager position.  In response, Shantinath did not promote Stokes but, instead, kept the position open for more than a year.

130.    Subsequently, Shantinath promoted a significantly lesser-qualified, inexperienced, and under-performing employee, Ordonia, to the position.  It did so without so much as offering Stokes an interview.  In pertinent part here, Ordonia was also substantially younger than Stokes, being at an age between 25 and 30 years old.  Additionally, Shah and Vora were substantially younger than Stokes and wanted a younger employee to serve as the primary face of client relations.

131.    Shantinath had no legitimate, non-discriminatory, and genuine basis to refuse Stokes the promotion or terminate him.  Certainly, Shantinath, through Shah and Vora, ever complained to Stokes about his performance or disciplined him in any way.  And, each time Stokes attempted to inquire about the matter, Shantinath, through Shah and Vora, intentionally avoided the discussion, hoping Stokes would just go away.

132.     What is more, Shantinath, through Shah and Vora, created an impossible, catch-22, and pretextual scenario for Stokes in order to assure his removal, as alleged, *supra*.

133.    Shantinath's treatment of Stokes occurred under the totality of facts and circumstances that give rise to an inference of impermissible age discrimination.

134.    But for Stokes's age, Shantinath would not have engaged in the conduct above, including termination Stokes's employment.

135.    Shantinath's treatment of Stokes was intentional, deliberate, willful, wanton, malicious, reckless, and in conscious disregard of Stokes's right to be free from age discrimination.

136.    As a direct and proximate cause of the same, Stokes has suffered monetary, liquidated, and non-monetary damages, and loss of back pay and benefits.

**COUNT V**
**Failure to Pay Overtime and Retaliatory Discharge in Violation of**
**the Fair Labor Standards Act of 1938**
**(All Defendants)**

137.    Stokes incorporates and re-asserts fully herein the allegations of paragraphs 1 through 136, *supra*.

138.    Defendants' failure to compensate Stokes for his approximately 21 hours of overtime hours each week at the Hotel and retaliatory discharge of Stokes after he complained of his hours and compensation violated the Fair Labor Standards Act of 1938 ("FLSA").

139.    Concerning overtime, the FLSA directs, "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207 (alterations added).

140.    Concerning retaliation, the FLSA further provides that no employer may "discharge or in any other manner discriminate against any employee because such employee has filed any complaint . . . under or related to this chapter." 29 U.S.C. § 215(a)(3).

141.    Defendants meet the definition of an employer under the FLSA. 29 U.S.C. § 203(d).

142.    Defendants employed Stokes from March 2018 until January 20, 2020, and Stokes suffered work on their behalf during that period.

143.    Starting in July of 2018, Defendants required Stokes to work a fixed 56-hours per

20

week, as opposed to his earlier 40-hours per week schedule.  In practice, Stokes actually began to work 59 hours per week, and Defendants, particularly Shah who resided on the Hotel premises, was aware of the same.

144.    Consequently, from July of 2018 to January of 2020, Stokes worked 21 hours each week in overtime.

145.    Defendants, however, did not compensate Stokes for these hours in the requisite manner.  Under the FLSA, they were required to compensate Stokes for his overtime hours at a time-and-a-half rate of $15.96 per hour, in light of his $31,000.00 annual salary.  Instead, they in practice under-compensated Stokes at only $10.64 per hour, resulting in Defendants owing Stokes $5.32 for each hour of overtime he worked between July 2018 and January of 2020.

146.    In light of his duties and the duties he lacked, no genuine or good faith basis existed to change Stokes from an hourly to salaried employee, classify Stokes as a salary-exempt employee under the FLSA, and exempt him from the overtime compensation requirements of the same.

147.    Defendants were aware of their legal obligations under the FLSA, including but not limited to Stokes's employee classification and overtime.  They were also aware that Stokes was protected under the FLSA in his ability to file and present a complaint, informally or otherwise, to them concerning these matters.

148.    Defendants were aware that Stokes was working the above overtime hours each week and that they were not compensating for those hours.

149.    And, when Stokes complained and presented his complaint and grievance through Defendants' only grievance channel concerning his compensation and hours in December of 2019 and January of 2020, Defendants' ultimate response was only to issue Stokes an ultimatum, which they carried out through his termination.

150.    No legitimate, non-discriminatory, or genuine basis existed to subject Stokes to this adverse employment action.

151.    Stokes engaged in protected activity by presenting, or in other words filing, a complaint to Defendants concerning his compensation and hours.

152.    Defendants were aware and on fair notice from that presentation, or in other words filing, that Stokes was complaining of an issue and asserting rights the FLSA squarely covers.

153.    Notwithstanding, Defendants responded by subjecting Stokes to material adverse actions, up to and including his termination.

154.    Under the facts and circumstances above and given the timing of the material adverse actions, an undeniable causal relationship exists between Stokes's complaints and Defendants' material adverse actions; in other words, the one led to the other.

155.    Under the facts and circumstances above, Defendants' acts and omissions in so far as the FLSA is concerned were intentional, deliberate, willful, wanton, malicious, reckless, and in conscious disregard of their obligations and Stokes's rights to overtime compensation and to engage in protected activities under the FLSA.

156.    As a direct and proximate cause of the same, Stokes has suffered monetary, liquidated, and non-monetary damages, including back pay and overtime.  As a result of his retaliatory termination, he has also suffered significant emotional distress, reputational harm, embarrassment, humiliation, shame, and a loss of enjoyment of his life

## PRAYER FOR RELIEF

Wherefore, Plaintiff Kelvin Stokes requests the following relief against Defendants:

(a)    Compensatory damages;

(b)    Punitive damages;

22

(c)     Back pay;

(d)     Liquidated damages;

(e)     Injunctive relief, including reinstatement, a promotion to assistant general manager with a raise, and the expungement of Stokes's personnel file of any mention of dismissal, termination, and adverse action;

(f)     Attorney's fees and costs, in an amount to be determined at trial;

(g)     Pre- and post-judgment interest; and

(h)     Any such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff Kelvin Stokes demands a trial by jury on all issues so triable and reserves the right to amend this Complaint to add new claims and parties as discovery may warrant.

**Respectfully Submitted,**
**KELVIN STOKES**

_____/s/_____
Nicholas Simopoulos, Esquire
VSB No. 68664
Simopoulos Law, PLLC
11 South 12th Street
Richmond, Virginia 23219
(804) 220-5755
nicholas@simopouloslaw.com
*Counsel for Plaintiff*